Okay, the first case in the afternoon is in re Marriage of Rone 514-0462. Mr. Kibler? Mr. Campanella? Miss Kibler, I'm sorry. Oh, it's her. I thought it was Keith. Got it. Winter Campanella. Got it. Thank you for setting me through. Yes, sir. You may proceed. Thank you very much. Mr. Rone Pellant is 72 years old. He has income of $1,200 in Social Security. Has a very long list of ailments highlighted by liver cancer. A recent severe heart attack, high blood pressure, MRSA, which results in boils, abscesses, and unfortunately, incontinence. He had been a consultant at a gym facility that was previously owned by the party's daughter in Marion, Illinois. And he had a income at one point in time of $25,000 a year as a consultant. At the temporary hearing in this case, he agreed on a temporary basis to pay $200 per month and to pay for his soon-to-be-exilized electric bill, gas bill, water bill, telephone bill, cable television bill, and insurance on her vehicle. Neither one owned the dwelling that the two of them had been living in. Their daughter owned that as well as another house. He moved into the daughter's house that the daughter lived in, and Mrs. Rone stayed in the house that the parties had lived in that the daughter owned. It took about 18 months for a variety of reasons to get the case to final hearing. At final hearing, he testified that he had, for the previous 18 months, been able to do his job as a consultant, sometimes went there, but had not been able to perform his duties, that his daughter had been paying him anyway, which was the source of the funds that he'd used to pay all the bills for his wife, that his doctor had ordered him to stop working, and that at the end of the day, that day, he was done being employed because he was being paid for something he wasn't able to do because of the ailments that I previously outlined. But he was still working as of the hearing. I mean, he said he was going to... He was still being paid. He was... I'm sorry. I'm sorry. He said he was going to not work. Right. But he was still getting the paycheck. He was still getting the paycheck. He still had the income. He still had income up to that day, okay? And then his testimony, which was uncontroverted, was that that was stopping that day, okay? And then testified that the main asset of the parties was a fund, half of which would have been $61,000 apiece, and the parties agreed to equally divide that. And much testimony was given about personal assets, vehicles, and all those kinds of things. And then the court made a decision, and the court's decision was that maintenance was barred, that each party got $61,000, that the assets were divided, including... I'm going to try and say this and not even smile. Two Yorkie dogs were equally divided. One went one direction, one went the other. My client gave much testimony and, in fact, teared up in court over his love and affection for the Yorkie dog named Charlie, that he had paid $1,700 for this dog and cared for this dog and loved this dog. And at the end of the day, so to speak, Judge Lewis gave $1 to Mrs. Roan and gave Charlie to my client. Which is the subject of the cross-appeal. Which is the subject of the cross-appeal. Right. Okay. Let me ask you a question, Mr. Kibler. Yes, please. The court's order of June 18, 2014, which you're leading up to here... Yeah, okay. It's next. But what I'd like you to address is I'm having trouble understanding what Judge Lewis ordered. Because he says respondents shall continue to pay maintenance. Doesn't say how much or anything. Right point. And then goes on to say until such time as employment terminates and his income is proportionately reduced. I want you to explain to me, I mean, maybe I have not read the transcript of the proceeding at this point in time. Okay. I mean, maybe it's clear to everybody what he's talking about. It's not clear. Please address that. That's a really good question. I mean, I think I can address it, but I don't think I can explain it because I'm not inside the court's head. Mrs. Roan filed a motion saying he's still working or he's able to work. Tried to offer evidence that he had come to her home that was owned by their daughter and using a small electric chainsaw had cut some tree limbs down in the yard and done some light yard work. And she also tried to testify that she had, Mrs. Roan had driven by the daughter's business and seen her ex-husband at that point in time vehicle at the business. The judge says, well, that's not proper evidence for this hearing. It would have to be evidence that existed at the time of trial that for a variety of reasons couldn't be produced. And he said, I'm not going to allow that or hear that. You can do an offer of proof, but I'm not going to consider it for any substantive purposes. And so he said, because it's an offer of proof and it's not going to be considered by me for any substantive purposes, he said, Mr. Kittler, you are not going to be allowed to cross-examine anything that's brought in during that offer of proof, and you may not produce any of your own evidence. It's an offer of proof. I'm not going to consider it. Go ahead. So Mrs. Roan said, I've driven by there and I've seen his car or his truck, and here's some pictures of him cutting things down. The judge said, you don't have anything more? Mrs. Roan didn't have anything more. So when I got the order saying that he was reconsidering his ruling barring maintenance, oh, the only other thing that occurred in the hearing that is of note is the judge, and this is actually in his oral comments in the transcript. He said, why don't you all just file, if you believe he's working somehow, not that he's able to work, but if you believe he's working somehow, why don't you file a motion to modify? And then he kind of looked up and said, oh, you can't because I barred maintenance. Okay, well, this is still just an offer of proof. And then turned around and made a ruling saying that he was reconsidering his ruling and says in his order that the reason he's reconsidering, the only reason that he put down that he's reconsidering his order is that it's alleged in the motion hearing that he was working. Well, I don't know what that means, but that's not proper proof under a motion under the statute. Well, how much maintenance was your client ordered to pay? $200 per month. How can you tell that? It just says he shall continue paying maintenance. Well, that's what he was originally ordered to pay, and then he also – is that what the court meant by saying that? I don't know that. That's my question. I mean, should we as a court presume that that's what he meant as to the amount and why? Did he say something? He didn't say anything more. All he said was – what he said was I'm only going to consider this for an offer of proof. I'm not going to allow you to cross-examine on the subject, and I'm not going to allow you to produce any evidence because if I had produced evidence, what I would have produced was he's not working, the place is going to be sold, and subsequently has been sold, there isn't any income whatsoever other than my guy's Social Security. I mean, we're really here about much ado about nothing because we've been hemmed in by what I would – I perceive bluntly as a misapplication of the rules of evidence regarding an offer of proof and a motion for reconsideration. Justice Stewart is asking you, where do we find the original order that requires maintenance be paid? There's a temporary order, and I would have to find it. It's in the record, though. It's in the record, yes. Well, and just – and my question was, I mean, what is it that makes us – I mean, he says he's – the judge says he shall continue paying maintenance. He doesn't say continue paying the same amount of maintenance he paid temporarily. He doesn't say some other amount. You're right. He doesn't. And, in fact, I don't mean to jump in the middle of Winter's argument, but she filed a motion with the court after we did this appeal asking the court to clarify what it meant, and he said, I don't have jurisdiction to say anything about this case. It's at the Fifth Circuit. Okay. And so neither her nor I can really say exactly what he had in his mind because he didn't tell us. I mean, doesn't an order have to be sufficiently specific for a person to be able to be in compliance with it without being held in contempt? Yes, I believe it does. But we had gone round and round with this so many times that finally both counsel and Judge Lewis agreed that this was an appealable issue that you needed to speak to, and that's why he then finally did an order saying this is a final appealable order taken to the Fifth Circuit. And so my confusion with the final appealable order, though, is you say that he probably used the offer of proof as the basis for his order. Yes, ma'am. I think we're talking, so the record is clear, the June 18, 2014 order, right? Yes, ma'am. But it seems like in his order he at least tries to say, excluding for the moment the amounts, he tries to say that your guy was employed as of the date of the hearing, that there was no evidence that he wasn't going to be employed, and you dispute that. I mean, that's how I read this order, but it's very tough to understand. It is, but off the top of my head, what the order actually says is, doesn't it say it's alleged that the… It says now they have alleged he remains employed at the time of the hearing. That's my point. Because that came out of the offer of proof. Yeah, that's the only way that could have been. That was the only testimony there was at the hearing. But as of the date of the hearing, he was still employed. As of the date of that hearing? No, ma'am, he was not. No, no, no. The date of the original order… Back in January of… Right, when he said he was not going to be as of tomorrow or… No, he said as of that end of that hearing, that moment, that he was not going to be employed. I do not believe that that's what Judge Lewis was referring. He wasn't dating his comment back from June to January. Okay. He was talking about at that end. Okay. And in the motion to reconsider, they did allege that he was still employed. Yes. And so that's what he's talking about. That's what he's talking about. I think that's clear. It's just an allegation. Yeah, it's just an allegation. But not only does that allegation not meet the standards of the motion to reconsider, the fact that he allowed it as an offer of proof and then prevented me from cross-examining or putting the testimony onto the contrary was really grossly unfair. How did the offer of proof get put on? Did somebody get up and testify? And she said that she had these photographs of him showing up at her house, which this I think pretty squarely falls into the category of no good deed goes unpunished, and went to her house and cut some limbs off some of her trees for her. And she took pictures of him and brought him in and said, see, he's able to work. He cut limbs off my tree. And I was like, I want to chastise my client. Could be smart. Which, of course, didn't prove that he was working, and neither did the fact that she had been driven by her daughter's business and seen his truck there. There's no evidence that he was driving the truck. He also lives with a son who is employed with a business. But they certainly had no financial documents that would indicate that. Oh, absolutely none, zero. The totality of the evidence was exactly what I just said. And it was the same as at the original hearing? Yes. We also have the issue of a chartered dog, and I think that that's within the sound discretion of the trial judge. The photographs were awarded to my client. She was told to make copies of whatever she wanted, and she came back and said she couldn't afford it. Well, as soon as we get through this appellate process, she's got $61,000. I think she copied over her. It's full of copy. That's kind of where we're at. So the $61,000 has not been distributed yet? Neither has the dog. We all just agreed to stop until we actually went back to the trial court. 34 years, I've never had this discussion at all, ever, in an appellate court or whatever. I may have argued against you in something like this. I argued let's swap the dog for the money, and everybody was so tore up over the dog, we all just quit until you decided what you were going to do about the dog. That's the truth. How old is Charlie? I'm just wondering. You know, I don't know that. That's okay. Never mind. We've got eight. I'll work on that. Charlie is eight years old. Well, hopefully we'll try to get this case over with. I don't know how old the other dog is. Have the remains been distributed? No, all the dogs are still alive. Oh, I saw some posthumous remains. No, there's two dogs. The cats? Yeah, the cats may be posthumous, but nobody's appealing about the cats. Okay, so everything else has been distributed? Everything. The personal property has been distributed. Both dogs are in Mrs. Roan's possession, and my client would love to swap the $61,000 for the dog. I even went back to the trial court and tried to work out a dog visitation thing, and it was just too painful. Let me ask you this then. What do you want this court to do? What kind of relief do you want from this court? Easy. Two things. The court's sound discretion was met in distributing the dog and the photographs, and I believe that sound discretion is what we're looking at. And then on from a de novo issue from a matter of law, the court erred and reconsidered its ruling. I mean, I guess if you wanted to, you could send it back for an evidentiary hearing on the issue of back on that date, was he employed, is he employed now. But I don't know that you really can do that underneath the evidentiary rules, because evidentiary rules require some kind of new evidence. And I think that Mrs. Roan is sadly stuck with the issue of the fact that maintenance was barred. So the best case scenario for you would be to affirm the judge's original trial order? And I'll get a dog and they'll get $61,000. Not me personally. I'm allergic to them, so I understand. Any other questions? Did I answer your question? You did. Thank you. Ms. Campanella. Your Honors, Counsel, I wish to address a couple of things that my learned colleague mentioned first. First off, some of the expenses that Mr. Roan was ordered to pay, in addition to the $200 a month were left off by Mr. Kibler, include the car registration, a credit card bill, and a senior citizen's expense. Since I did not represent Ms. Roan at the time of trial, I'm not exactly sure what expense we're talking about here, but that's what he was ordered to pay. That was in a written temporary order? Yes, Your Honors. And did it say that all that was maintenance? Yes, it does. It classifies the $200 a month plus those expenses as maintenance. And I'll ask you the same question I asked Mr. Kibler. How is it from this order, it just says he shall continue to pay maintenance. How do we know what he's supposed to pay and why should we just presume that it's the same thing as before? The word continue I think is what we need to hang our hat on at this point. Continue to pay maintenance. I think the word continue draws us back to the court's previous order. It would be nice if there were a couple more words in there. Well, I tried to get that going. Like the word the same maintenance or something like that. I attempted to get some clarification for this court and I wasn't successful in doing so. As such, I would argue, I would ask this court to hang your hat in considering the word continue. So you take the position that that's what the court meant? Yes, I do, Your Honor. The same maintenance as before. The same maintenance as before. And I actually, in addressing a couple of facts that Mr. Kibler stated, the parties did not agree to divide the Woodman of the World account, which is where the $61,000 comes into play. What had happened at second stage is that there was a list provided to the trial court and that was on it. And Judge Loos appears to have pretty much just gone off of that list that was provided to him by Mr. Kibler. With regard to the personal property, I believe, I can't remember which one of you asked whether or not personal property had been exchanged. Actually, my client has not received the vehicle. That is still in the possession of Mr. Rome, so not all of the items have been exchanged. Had the respondent moved out as of the time of the first hearing? The second stage hearing? The second stage hearing, yes, January 15th. Yes, Your Honor, the parties were physically separated at that point. The respondent was living, I believe, with his daughter in a different residence. So, in this order of January 15th, if this court softened to just affirm this order, there would still be things to be done underneath this order, let property be exchanged, things of that nature. Yes, Your Honor, however, that order, we argued that that order was an abuse of discretion with regard to maintenance. Right, because it denied maintenance completely. Correct, Your Honor, it did. And Mr. Kibler mentioned his client's situation. My client is 68 years old, has ADHD, reading comprehension disability, and dyslexia. 68 isn't so far away anymore. It's the new 50. My client, when you review the records, you'll see there was really no medical testimony provided by any party. Both of them kind of just touched on their health issues. But my client will not be able to support herself at any point in time with her issues. And as you read her testimony, you'll see how she bounces all over the place, even when her own lawyer at the time is asking her questions, more so than, I would say, the average individual who's nervous about testifying at trial. One other point, Your Honors, to take a look at is the income of Mr. Rohn at the time of trial. Mr. Kibler testified he was somewhere in the $1,000 range. Mr. Rohn had filed a financial affidavit stating his income was $3,837 a month. My client's income at the time was $649 a month. That is a big income disparity at the time of the second stage hearing. Go ahead. Was there an itemization on that $3,000? I believe that was in the financial affidavit, Your Honor. What did it say? I don't have the record in front of me. I believe some of it came from Social Security disability and then his work for the gym owned by his daughter. But was there evidence? There was evidence, I thought, that that was his last day. That's what he had testified to, which then brings me into the motion to reconsider, which was filed on behalf of Mrs. Rohn. The basis for the motion to reconsider was the fact that the court had erred, in our opinion, in barring maintenance, and the newly discovered evidence of the fact that he was, in fact, continuing to work. And while Mr. Kibler argued that… Now, what do you mean when you say continue to work? That means at this place or cutting the tree? Both, but mainly he was at the gym. He didn't get paid for cutting the tree, though. I'm sorry? Did he get paid for cutting the tree? No, Your Honor, but he was… One of the arguments he presented at second stage was the fact that he was physically unable to work. Oh, okay. So the fact that he was out doing yard work, our argument was that he is physically able to do something. The offer of proof, when you go back and you take a look at the transcript of the motion to reconsider hearing, you'll see the offer of proof is related to the pictures. The offer of proof had ended, and I asked Ms. Roan a question. Like, we had a little bit of a discussion on the record about the offer of proof being over. Then I asked Ms. Roan a question about seeing her husband's vehicle at the gym. So that, I would argue, is outside of the offer of proof. How does seeing his car at the gym prove that he's working or has any income from the gym? The fact that he… The answer is it doesn't. Right? I can see where that would be someone's position, yes, that it doesn't prove. It's not financial documentation, Your Honor. That's true. It's not. It doesn't prove at all that he's getting any money or that he's actually working just because his car is parked there. Just because his vehicle is parked there, there's no evidence that he drove the vehicle. That's exactly right. If I may shoot myself in the foot for a moment, if I may. You know, that's completely true, Your Honor. The fact of the matter is maybe his daughter borrowed his vehicle. We don't know. So what evidence, if any, did the judge have at the time of the hearing on the motion to reconsider that would justify changing his original ruling? The fact that Mr. Rohn was working at the time of second stage hearing and a motion to reconsider… What was the proof of that? His own testimony. He was receiving income at the time of second stage. Oh, he testified at the second stage hearing. Yeah. Okay, so you're just saying the judge could have just looked back and said I made a mistake before and… Yes. But instead he said it's been alleged here that… What about Mr. Kindler's argument that he was not going to be paid as of that day of the hearing? Well, he says he's not going to be paid as of that day. Now, there is a section of the Illinois Marriage and Dissolution of Marriage Act that does allow for modification. So the court, he is being paid at that point in time. The trial court should have taken that into consideration, not what he testified is going to have because he has a financial interest to testify. He's not going to be paid after that day because he doesn't want to pay my client maintenance. So he testifies I am being paid right now. The court should have awarded maintenance on that. And then when he retired, he filed a motion to modify under Section 510. That's the proper course, and that's not what happened here. Judge Lewis took him at his word and, in my opinion, erred. Well, I mean, you know, the judge has to determine the case based upon the evidence that comes before him at the time of trial. And there are lots of cases. I mean, what if a guy gets on the stand and says, yeah, I'm working, but I got a notice I'm terminated in two weeks. And I'm going to draw unemployment compensation. I mean, doesn't the judge almost have to then base his ruling on what the true facts are about what his income is going to be? Your hypothetical is a little bit different than the situation, Your Honor, in that in your hypothetical, that is outside of the person's control. He's been laid off. He's been terminated outside of his control, whereas Mr. Rohn had control over whether or not he was going to retire. There was no testimony whatsoever that he was being laid off. He was being fired. It was he was making that conscious decision. So that's where I would assume it. At age 72? At age 72, yes. Most people will get to determine when they retire at age 72, don't they? I don't know, Your Honor. I'm only 35. Okay. A baby. But I guess in follow-up to that, the daughter was really taking care of her father by issuing him an income. Is that what you produced, trial? I mean, basically, what was he doing? A consultant. But that's a way to give your parent an income, pay taxes, et cetera, without making a gift, right? That's, yes, arguably correct, Your Honor, yes. So whether he determines his own retirement is really dependent on whether the daughter is going to say, no, we're just going to continue this same kind of pattern. I mean, as we sit here today, we don't know if he's working or not. Correct. At this particular moment in time, I don't know whether or not he's working, so to speak, or not. I know, which, you know, that would be new evidence, obviously, entered in this matter. There are some things that have happened with the gym that are well known in the Marion area, but, you know, we don't know whether he's working. Well, that works out for us. Does anyone have any other questions about maintenance before I go on to Charlie? No, you're playing it. Okay. Thank you. Don't guarantee we won't interrupt. That's fine. This isn't about me. I just want to ask, make sure you all- No, please proceed. Thank you, Your Honor. We are here also with regard to Charlie, a shih tzu that was awarded to Mr. Roan. A shih tzu or a yorkie? Oh, sorry, a yorkie. I don't know dogs. Small, loud. Charlie is, Mr. Kibler testified that Natasha, another dog, was provided to Mrs. Roan, and Charlie, Mr. Roan's prized possession was awarded to Mr. Roan. However, Mr. Roan took no, he vacated the premises and left Charlie with Mrs. Roan December of 2012. Filed no petition for temporary release requesting possession of Charlie. The dog has a microchip in his skin that was originally registered to Mr. Roan. During the course of this case, Mr. Roan calls and has the microchip changed over to Mrs. Roan as the registered owner. He pays no veterinary bills, exercises no control over the dog at all. And the trial court awards the dog to Mr. Roan. Now, in my research, finding a case similar to this, I have a higher likelihood of winning the lottery. However, I found a case that I was, I think, similar but does not deal with a dog. In fact, dealt with a fidelity account, and that was the Barnett case. In the Barnett case, the joint fidelity account had been transferred to wife, and sometime later the parties were going through a divorce, and the husband was trying to argue that the $1.6 million account was not a gift to the wife. The court focused more on control. Did he exercise control? That was a second district case. The appellate court, in their analysis, focused more on, sorry, that was a fourth district case, focused more on control. And they looked at, well, Mr. Barnett had no control over that account. There was no evidence at all that he intended that account to be returned to him. Therefore, it was a gift to wife, and it was proven by clear and convincing evidence. Those, well, we're talking about a different piece of property. We're talking about a dog as opposed to a $1.6 million account. The facts are very similar in that we have a piece of property that was, in essence, held in husband's name, but it was a marital asset. It was purchased during the marriage, and it was transferred to wife's name. Husband had no control over it at all. So you're equating changing the microchip to, like, a change of title? That's part of it, yes, I am. Well, I mean, you're saying ownership was changed from him to her while the case was pending. How did that happen? Mr. Rohn called the microchipping company. Well, I mean, that's what I'm saying. There wasn't anything else that he did. I mean, there weren't any kind of papers, dog papers or anything. So how is changing the name on the microchip a change of title or ownership? He removed his name as the registered owner. As the person to call in case of an emergency. And changed it over to his wife, and exercised no control at all over the dog.  Correct, because under 501 of the Illinois Marriage and Dissolution of Marriage Act, he could have filed a petition for temporary relief, requesting temporary possession of the dog during the course of this case, and he never did. Now, are those papers changing that over in the record to show that it wasn't just changed his address? In other words, the address stayed the same, but the address is now in her name as opposed to his name. Therefore, the dog being there is addressed at that place. So that's why you call that house to notify that they found the dog or something. Or did it say, I hereby give complete power or whatever control and ownership of the dog to Mrs. So-and-so. The actual documentation of the change, I don't remember seeing that in the record. Okay, it's not in the record. Just testimony? Just testimony about it from both parties. When he left, he could have taken the dog with him. Yes, he could have. Did he take property with him when he left? I'm not sure. I'm sure he took, you know, some effects with him. But he, again, during the whole course of this case, did not file any pleadings to try and get temporary exclusive possession of Charlie during the course of this action. It was just at the final, or the second stage here. Correct, yet this dog is his prized possession, and he cried on the stand because of it. This sounds fairly acrimonious to split. Am I correct? I wasn't at the second stage hearing, but I would agree with that assessment, Your Honor, yes. Okay, thank you very much. Thank you. We'll hear from Mr. King. And to the extent we took some extra time, Mrs. Campanella will forge you that extra moment, those extra moments, if you need them. I have an advantage because I have been with this case from the beginning, and not only case, but cases. And to answer your question. Not only case, but what? Cases, as in plural, as in counsel's explanation about him leaving voluntarily and leaving the dog behind. That was because a criminal charge was filed against him, causing him to have to extricate himself from the home and the presence of Mrs. Brown. And so the reason for the delay of this case for 18 months was because we couldn't do the second stage trial until I tried the criminal case, which I did. And those things are in the record but are not a part of the brief. We're now outside the briefs, but you asked the question. She filed a criminal case against him dealing with rose bushes. I had to try that case in a criminal court in Williamson County. I did, and he was not guilty. And then we were allowed to go to the second stage. So he did not abandon the house, the rose bushes, or Charlie the dog. He was taken from the facility. Thank you for the clarification. You're welcome. My client thought that I had not fought for his honor and not abandoning that dog. I would never hear the end of it. Counsel is correct in that the order for temporary relief, in addition to the things I stated, says that my client would continue to pay $60 a month on a credit card bill and $40 a month to senior citizens and repair for her vehicle. She is incorrect in saying that my client has her client's vehicle. Her client has always had her vehicle and still does. Does the court have any other questions? I just want to clarify that because I tried those various things. The consensus is we do not. Thank you, Mr. Gibbons. Okay, we'll take this matter under advisement and issue a disposition of divorce. Thank you, counsel.